FILED
JAN 2 5 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

World Can't Wait, *et al.*,

    Plaintiffs,

v.

Gale A. Norton, Secretary
U.S. Department of the Interior, *et al.*,

    Defendants.

CASE NUMBER 1:06CV00138

JUDGE: Ricardo M. Urbina

DECK TYPE: TRO/Preliminary Injunction

DATE STAMP: 01/25/2006

## MOTION FOR TEMPORARY RESTRAINING ORDER

World Can't Wait, a non-profit group, through counsel, files this motion for temporary restraining order against the Defendants, National Park Service United States Department of the Interior, *et al.*. This motion is in accordance with Federal Rule of Civil Procedure 65 and Local Rule 65.1. World Can't Wait requests this Court restrain the National Park Service from denying World Can't Wait's First Amendment rights by refusing to grant their permit application for the space known as the Capitol Reflecting Pool.

A proposed Order, and a Memorandum of Points and Authorities accompany this motion.

Counsel for World Can't Wait certifies that actual notice at the time of making this application, and copies of all pleadings and papers filed in the action to date or to be presented to

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
JAN 2 5 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**World Can't Wait**, *et al.*,

    Plaintiffs,

v.

Gale A. Norton, Secretary
U.S. Department of the Interior, *et al.*,

    Defendants.

Civil Action 06-_____ 06 0138

## MEMORANDUM IN SUPPORT OF MOTIONS FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

World Can't Wait, a non-profit group, through counsel, files this memorandum of points and authorities in support of their motion for preliminary injunction and temporary restraining order against the Defendants, National Park Service, the United States Department of the Interior, *et al.* (Park Service).

### I. STATEMENT OF FACTS.

On December 20, 2005, Travis Morales, a member of World Can't Wait, a non-profit organization, filed a permit application with the United States Capitol Police Board for "a loud and large peaceful legal demonstration outside the Capitol at the closest space we are permitted to assemble, taking place simultaneously with the President's delivery of his State of the Union address." Attachment 1. The permit requested the "West Front or as close to the Capitol as possible." Id.

Capitol Police notified Mr. Morales that a special security zone, set up during the President's address, would prevent World Can't Wait from using the "West Front" of the Capitol. Attachment 2.

Therefore, on December 21, 2005, World Can't Wait filed a permit application with the Park Service requesting the "Mall near the Reflecting Pool as close to the Capitol as possible." Attachment 3. The Park Service told World Can't Wait that a meeting addressing their permit application would be held on January 10, 2006. Attachment 2. The Park Service also informed World Can't Wait that the Mall was under renovation between 3rd and 7th Streets, but the area between 7th and 14th Streets would be available. Id.

On January 9, 2006, Mary Lou Greenberg, a representative from World Can't Wait, walked around the area World Can't Wait requested for their demonstration. Id. Between 3rd and 7th Streets, snow fences blocked the grass. Id. However, the grass inside the fences was sparse, muddy, and brown. Id.

On January 10, 2006, World Can't Wait met with the Park Service. Attachments 2 and 4. The Park Service Rangers present at the meeting reiterated that the grass between 3rd and 7th Streets was closed for renovation. Attachment 2. Ms. Greenberg explained why the demonstration required proximity to the Capitol. Id. Ms. Greenberg also indicated that World Can't Wait was only requesting the Mall up to 4th Street, and they would provide personnel to assist the Park Service with removal of the fences for the two [2] hour demonstration. Id.

During the meeting, Park Service representatives suggested that World Can't Wait utilize the concrete area surrounding the Reflecting Pool. Attachment 2 and maps in Attachment 5. After discussing the offer, World Can't Wait requested not only the Reflecting Pool area, but also the Mall up to 3rd Street. Attachment 2.

The Park Service did not respond to World Can't Wait's request for the grassy areas at the meeting. They said the Regional Director had to make the decision to allow use of the grass. Id.

Before the meeting ended, the Park Service asked World Can't Wait to file an amendment to their application indicating the area encompassed by their altered request. Id. Mr. Morales immediately wrote an addendum to World Can't Wait's initial application. The addendum requested the reflecting pool area and the "opening of the closed area between First Street and 3rd Street for First Amendment protected activities. This is a compromise agreement." Attachment 6.

Throughout the January 10, 2006, meeting, a representative of the Capitol Police, Seleta S. Kirkland, indicated no problem with the Park Service's suggested demonstration area. Attachment 2.

On January 11, 2006, Ms. Greenberg called Park Ranger Leonard Lee to check the status of World Can't Wait's application. Attachment 2. Ranger Lee told Ms. Greenberg that he briefed the Deputy Regional Director about World Can't Wait's application, and he [the Deputy Regional Director] planned to discuss the situation with the Regional Director. Id.

On January 19, 2006, Ranger Lee called Ms. Greenberg to request more logistical information about World Can't Wait's planned demonstration. Id. Ranger Lee told Ms. Greenberg that the Park Service intended to issue a permit, but he was unsure about the approved location. Id.

That afternoon, World Can't Wait's attorneys, Mark Goldstone, James Klimaski, and Art Spitzer, received a facsimile partially denying World Can't Wait's permit application. Attachment 5. The Park Service indicated that some of the requested areas would be closed for security reasons. Id. The denial said that on January 11, 2006, the Capitol Police requested closure of the area, and the next day, January 12, 2006, they presented a new security map. Id. The only area World Can't Wait received a permit for was the gravel and concrete sidewalks

-3-

between 3rd and 4th Streets. Id.

The permit, as granted, does not provide World Can't Wait adequate space for their demonstration. Attachment 2. On both permit applications (Attachments 1 and 3), World Can't Wait specifically indicated an intent to use a stage. The permitted areas for demonstration will not allow room for a stage. Attachment 2. Additionally, only allowing World Can't Wait to use the sidewalk areas, and not the grass, forces the demonstrators to spread apart from each other in a way that makes communication and unity difficult, if not impossible. Attachment 2.

## II. ARGUMENT.

"A court considering a plaintiff's request for a preliminary injunction must examine whether: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." Serono Laboratories v. Shalala, 158 F.3d 1313, 1317-1318 (D.C. Cir. 1998). All of the factors should be considered without weighing one above the others. Instead, the four [4] factors must be balanced. Id. A strong argument for one factor can allow the injunction to proceed even if the argument for other factors is lacking. Id.

The same standards apply for both a temporary restraining order and a preliminary injunction. Experience Works, Inc. V. Chao, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

### A. There is a Substantial Likelihood that World Can't Wait Will Succeed on the Merits.

World Can't Wait will succeed on the merits of this case. The Park Service violated World Can't Wait's First Amendment rights by denying them use of the area around the Capitol Reflecting Pool and grassy areas of the National Mall.

### 1. Legal Standard.

When the Government limits First Amendment expression, the burden is on them to justify those limitations. Initiative and Referendum Inst. v. U.S. Postal Service, 417 F.3d 1299, 1310 (D.C. Cir. 2005).

The level of scrutiny applied to a governmental decision limiting speech depends on "whether the property in question is a traditional public forum, a government-designated public forum, or a non-public forum." Lederman v. USA, 291 F.3d 36, 41 (D.C. Cir. 2002). "There is no doubt that the Capitol Grounds are a public forum." Cmty. for Creative Non-Violence v. Kerrigan, 865 F.2d 382, 387 (D.C. Cir. 1989). In a public forum, the Government can only restrict expressive conduct in very limited ways. Id.

In public forums, time, place, or manner regulations must be: (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) allow for alternate channels of communication. Id.

### 2. The Government's Restrictions are not Content-Neutral.

In this case, the Government's restrictions are ostensibly based on security needs. However, the Court cannot assume that the government's restriction is content-neutral, because the current administration consistently provides their supporters with access to areas they deny their detractors.

### 3. The Government's Restrictions are not Narrowly Tailored.

There is a four-part test to determine if the Government's restrictions are narrowly tailored. Lederman, 291 F.3d at 44. First, the Court must scrutinize the restrictions "to determine if they indeed promote the Government's purposes in more than a speculative way." Id. Second, "per se bans on expressive conduct are inherently suspect." Id. Third, although the

Government has some discretion, "the Constitution does not tolerate regulations that, while serving their purported aims, prohibit a wide range of activities that do not interfere with the Government's objectives." Id. Finally, it is relevant if a "substantially less restrictive regulation would be equally effective in promoting the same ends." Id.

A restriction is "narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." Initiative and Referendum Inst., 417 F.3d at 1307. The Government cannot withstand a First Amendment inquiry by arguing that "the regulation serves an admittedly legitimate interest." Cmty. for Creative Non-Violence, 865 F.2d at 390. There must be a "real nexus between the challenged regulation and the significant governmental interest sought to be served." Id. at 388.

In this case, the Government makes two arguments regarding World Can't Wait's permit application. First, they claim that the grass is under renovation and cannot be used. Attachment 5. However, Ms. Greenberg inspected the grass and found no evidence of renovation. As the grass is not currently growing, no damage would occur. Additionally, World Can't Wait volunteered to assist the Park Service with removal of the fences located around the grass.

Second, the Government requested that a large area surrounding the Capitol be closed prior to/ and during the President's State of the Union address. This closure is designed to create a secure perimeter, permit the Presidential motorcade to move unimpeded, and allow for movement in and out of the Capitol. Attachment 5.

Although the Government's reasons may be valid, their restriction prohibits activities that will not interfere with their goals. World Can't Wait has no intent to block roadways or paths leading to the Capitol. Attachment 1 (World Can't Wait's application refers to their plan for a "legal" demonstration). The area in question is not on the route of the motorcade. The

Capitol Reflecting Pool is bordered, to the North, by Pennsylvania Avenue and, to the South, by Maryland Avenue. These sections of road are used as parking lots, not routes of travel. To reach the Capitol, the motorcade will either arrive via Constitution Avenue or Independence Avenue, both of which are already included in the security zone. Therefore, the Presidential motorcade can reach the Capitol, unimpeded, regardless of where the World Can't Wait demonstration occurs. Additionally, allowing World Can't Wait access to the Reflecting Pool area will still allow the Capitol Police to set up a secure perimeter about the Capitol Building. Finally, this is the first time the area in question has been included in the security zone set up for the State of the Union address.

General arguments regarding security cannot overcome First Amendment rights. In a similar case involving a security zone set up by the United States Navy during Fleet Week, the Ninth Circuit held that the Navy could not maintain a larger security zone than necessary to protect the public and Naval officials. Bay Area Peace Navy v. USA, 914 F.2d 1224 (9th Cir. 1990). In that case, the Government reasoned that a 75-yard security zone was necessary because of terrorism and the opinions of various military personnel. Id. at 1228. The Court held that, "although the Government legitimately asserts that it need not show 'an actual terrorist attack or serious accident' to meet its burden, it is not free to foreclose expressive activity in public areas on mere speculation about danger." Id., citing, Boos v. Barry, 485 U.S. 312, 330 (1988). The Government, in this case, has not indicated any concern about security beyond a general assertion.

### 4. World Can't Wait has no Alternate Channel of Communication.

World Can't Wait has no alternate channel of communication. The conditions imposed by the approved permit do not allow World Can't Wait to reach their intended audience. The

permit only provides them with sidewalk areas around large expanses of grass. It is not clear that effective organization or communication will be possible under those conditions. Additionally, World Can't Wait's permit application (Attachments 1 and 3), specifically indicates that a stage would be used to address the demonstrators. The space provided in the permit will not accommodate a stage. "An alternative is not ample if the speaker is not permitted to reach the 'intended audience'." Bay Area Peace Navy, 914 F.2d at 1229.

### B. World Can't Wait Will be Irreparably Injured if an Injunction is Not Granted.

World Can't Wait will be irreparably injured if an injunction is not granted. There is only one State of the Union address each year. The Government's failure to provide an adequate area for World Can't Wait's demonstration impinges their First Amendment right to express themselves about a key political event. Refusing to allow the demonstration to progress as designed restricts World Can't Wait's ability to spread their message in their desired manner. Regardless of the Court's final decision, refusing to grant an injunction allowing the January 31, 2006, demonstration to go forward as planned, would effectively deny World Can't Wait's First Amendment rights completely.

### C. An Injunction Will Not Substantially Injure the Park Service.

An injunction will not substantially injure the Park Service. As discussed above, the grassy areas in question will not be substantially injured by World Can't Wait's use. Additionally, World Can't Wait volunteered to assist the Park Service with removal of the fences.

In terms of security, there is no significant and defined risk to anyone by World Can't Wait's demonstration. No one will be injured or impeded by their presence.

**D. The Public Interest Will Be Furthered by the Injunction.**

The public interest will be furthered by the injunction. Upholding First Amendment rights is clearly in the public interest. Indeed, "the fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion." <u>Lederman</u>, 291 F.3d at 43.

### III. Conclusion

World Can't Wait should be granted a temporary restraining order and preliminary injunction forcing the Park Service to allow their demonstration.

January 25, 2006                    Respectfully submitted,

James R. Klimaski
Klimaski & Associates, P.C.
1819 L Street, N.W., 7th Floor
Washington, D.C. 20036
(202) 296-5600
Bar No. 243543